Johnson, J.
Three questions are presented by the demurrer to the petition.
1. Was the payment of these taxes an involuntary payment, within the purview of the statute authorizing the recovery back of taxes illegally assessed and collected ?
2. Is such tax on the gross receipts of a foreign telegraph company for the preceding year, where such receipts were mostly from messages pertaining to commerce, or on messages originating or terminating out of the state, or were chiefly earned on the company’s lines outside of the state, a regulation or restriction of commerce between the states, and so in conflict with the constitution of the United States ?
3. Is the act (S. & S. 769-771), under which this tax is assessed and collected, authorized by the constitution of this state ?
I. What constitutes such an involuntary payment of an illegal tax, as will warrant an action to recover the same back under the statute (2 S. & C. 1151), was considered in Stephan, Treas., v. Daniels et al., 27 Ohio St. 527, and in Baker v. Cincinnati, 11 Ohio St. 536.
In the light of those decisions, we are agreed that upon the facts stated in the petition, the payment of these taxes was not voluntary.
*528 An examination of the several provisions of this act (S. & S. 769-771) discloses the fact, that seven penalties and disabilities were incurred for making default in payment, amounting to a total exclusion of the company from transacting business within the state. The act provided no mode of redress nor gave the plaintiff a day in court.
The payment was made under protest, and with notice of this action, to avoid these penalties and disabilities. If the tax is illegal, we think this action may be maintained.
II. Is this act in contravention of the constitution of the United States ?
The petition states that the gross receipts, which the company was bound to return and upon which it was taxed, amounted to $172,297, of which $158,850.99 was for business “ which originated or terminated at a point or points outside of the State of Ohio;” and it is alleged that these messages to or from different states pertained to commerce between the several states, and that a larger portion of said receipts were earned on the company’s lines outside of the State of Ohio.
It is claimed that a tax on these gross receipts for the past year is the same as a tax on the messages themselves, and that a tax on messages between citizens of different states pertaining to commercial transactions is a state interference with the freedom of commerce among the states, and in conflict with the constitution of the United States.
By section 8 of article 1 of this constitution, the Congress possesses power, “ to regulate commerce with foreign nations, and among the several states, and with the Indian tribes.”
In Brown v. Maryland, 12 Wheat, 448, Marshall, C. J., in speaking of the power of the states, in view of these provisions, says : “ That the taxing power of the state must have some limits. It can not reach and restrain the action of the national government within its proper sphere. It can not interfere with any regulation of commerce. If the states may tax all persons and property found on their territory, what will restrain them from taxing goods *529 in their transit through the state, from one port to another, for the purpose of re-exportation ? Or what would restrain a state from taxing any article passing through it, from one state to another, for the purpose of traffic ? Or from taxing the transportation of articles passing from the state itself to another state for commercial purposes ?”
Erom this it was held, that a state law requiring an importer to take out license before he should be permitted to sell a bale of imported goods is void, and so is a state law requiring the master of a vessel engaged in foreign commerce to pay a certain sum on account of each passenger brought from a foreign country. Passenger Cases, 7 Howard, 273.
But a state may, in the exercise of its police power, forbid the sale by retail of spirituous liquors imported from abroad, or from another state. License Cases, 5 Howard, 504.
So “ a special tax on railroad and stage companies, for every passehger carried out of the state by them, is a tax on the passenger for the privilege of passing through the state by the ordinary modes of travel, and is not a simple tax on the business of the corporation.” Crandall v. Nevada, 6 Wall. 35.
Clifford, J., in Gilman v. Philadelphia, 3 Wall. 737, says : “ Right of intercourse between state and state was a common-law right, and, as such, was fully recognized and respected before the constitution was formed. Those who framed the instrument found it an existing right, and regarding the right as one of high national interest, they gave to Congress the power to regulate it,” etc.
The Hnited States Supreme Court set aside an act of the legislature of Pennsylvania (Erie R. R. v. Penn., 15 Wallace, 282), holding that—
“ A statute imposing a tax upon freight taken up within the state and carried out of it, or taken up without the state and brought into it, was repugnant to that clause of the federal constitution giving to Congress the power to regulate commerce between the states.”
*530 This decision was founded on the case of the State Freight Tax, 15 Wallace, 232, which arose on a law of the state of Pennsylvania, to provide additional revenue for the commonwealth.
This act required certain transportation companies doing business within the state, to report the number of tons of freight carried, and compelled them to pay a tax of so much per ton, on the amount carried.
The whole subject underwent a thorough discussion, and the conclusion was reached as above stated.
This conclusion rests on the ground carefully stated by the court, that it was a tax on the freight carried, and not on the aggregate business, nor franchises, nor property of the transportation companies. It was, in the view the -court took of the law, a tax on the thing carried, and for ■that reason was a tax on commerce.
The difference between a direct tax on an article of commerce, and a tax on the company carrying, by taxing its property, franchises, or business, is clearly shown by the «case of The Reading R. R. Co. v. Pennsylvania, 15 Wall. 284, where it was held, that “ a statute of a state imposing a tax ¡upon the gross receipts of railroad companies is not repugrnant to the constitution of the United States, though the .gross receipts are made up in part from freights received for transportation of merchandise from the state to another state, or into the state from another. Such a tax is not a regulation of interstate commerce.”
The court say: “ It is not everything that affects com:merce that amounts to a regulation of it,'within the meaning of the constitution.” “We think it may safely be .asserted that the states have authority to tax the estate, real or personal, of all their corporations, including carrying •■companies, precisely as they may tax similar property which belongs to natural persons, and to the same extent. We think also that such taxation may be laid upon a valuation, or may be an excise, and that in exacting an excise tax from their cor-porations, the states are not obliged to ¡impose a fixed sum upon the franchises, or upon the value *531 of them, but they may demand a graduated contribution, proportioned either to the value of the privileges granted, or to the extent of their exercise, or to the results of such exercise.”
Again: “ If the tax be upon the instrument, such as a stagecoach, a railroad car, or a canal or a steamboat, its tendency is to increase the cost of transportation ; still it is not a tax upon transportation or upon commerce, and it has never been seriously doubted that such a tax may be laid.”
For these reasons it was said a tax on gross receipts for transportation was not a tax on articles of commerce, but upon the fruits of commerce after they had reached the treasury of the company.
To the same effect is the ease of The Delaware R. R. Tax, 18 Wallace, 206, and Erie Railway Co. v. Pennsylvania, 21 Wall. 492.
In the case of The Delaware Railroad Tax, 18 Wall. 231, the supreme court nay: “ A tax upon a corporation may be proportioned to the income received, as well as to the value of the franchise granted or the property possessed.” And in Erie Railway Co. v. Pennsylvania, 21 Wall. 492, the court sustained the validity of the law of Pennsylvania, imposing a tax of three-fourths of one per cent, upon the gross receipts of the Erie Railway, although but forty-two miles of its whole line of four hundred and fifty-five miles lay within the state.
By a statute of Massachusetts a tax of four per cent, upon all premiums charged or received on contracts for insurance of property was imposed upon all companies foreign to the United States; a tax of two per cent, upon corporations organized under the laws of any other state than Massachusetts, while only one per cent, was imposed upon corporations organized under the laws of Massachusetts.
The Supreme Court of the United States held that this “ law of Massachusetts is no violation of the federal constitution.” Liverpool Ins. Co. v. Massachusetts, 10 How. 573.
In this case it was held that the business of insurance was not commerce, though carried on between citizens of *532 different states, and therefore such business might be taxed by the states.
This subject has recently been before the Supreme Court in Welton v. State of Missouri, 1 Otto, 275; Henderson et al. v. Mayor of New York, 2 Otto, 259, and Chy Lung v. Freeman et al., 2 Otto, 275.
Welton v. Missouri involved the validity of a license tax on peddlers, dealing in articles not the product or growth of the state.
It was held that such a tax was in effect a tax on goods, wares, and merchandise of other states brought into the state for sale, and therefore was a discrimination that interfered with freedom of commerce between the states.
It was further held, in that case, that the non-action of Congress on the subject of commerce between the states was equivalent to saying that it should be free, and that state legislation, of a restrictive character, against articles of trade and traffic between the states, by reason of their foreign origin, is an interference with that freedom and therefore unconstitutional. Commerce between the states relates to trade in articles of property. Telegrams or correspondence by any other method, although between citizens of different states, and although it may relate to commercial transactions, are not commerce.
They are instruments or aids to facilitate commerce. Like the vehicle on which goods or persons are transported from state to state, they may be indispensable to a successful prosecution of trade. These instruments of commerce have always been subject to state taxation.
Whether, if Congress should legislate on this subject, and make the telegraph lines part of the postal system, or declare them indispensable to trade and commerce between the states, and so exempt messages relating to commerce from state taxation, such a tax would be valid, we will not here inquire.
This law does not impose a tax on messages, but on the gross receipts of a previous period of time, and so ,within The Delaware R. R. Tax, 18 Wall., cited above.
*533 III. Is this statute (S. & S. 769-771) in conflict with the constitution of the state ?
This plaintiff’ is a foreign corporation, doing business within the state, with its principal office in another state. Its property within the state is taxed as other property.
The right of the state over such corporations, and its power to impose upon them terms and conditions upon which they may transact business within the state, as well as the general power of taxation, is involved in this inquiry.
The power of the state to collect taxes for public purposes, is an inherent and indispensable incident of sovereignty. Without it no civilized state could discharge its functions.
This power would exist without a written constitution. The object of constitutional provisions is to regulate its exercise by such limitations and restrictions as will protect the people against unjust or arbitrary action of the governing power. McCullough v. Maryland, 4 Wheat. 316; Providence Bank v. Billings, 4 Peters, 519; North M. R. R. v. McGuire, 20 Wall. 46; Debolt v. O. L. & Trust Co., 1 Ohio St. 563; Cooley on Taxation, 3; Cooley on Const. Law; The Federalist, Nos. 30-35. The constitution (art. 2, sec. 1) provides, that “the legislative power of the state shall be vested in the general assembly.”
The power to raise revenue for public purposes, being a legislative power, is thus expressly committed to the general assembly.
It is a grant of general power of taxation.
Limitations and restrictions on its exercise are to be found in other provisions of that instrument, and in the federal constitution.
Thus article 12, which relates to taxation, is not, as seems to be supposed, a delegation of authority to raise revenue, but a limitation of that power as conferred by article 2, section 1.
In Hill v. Higdon, 5 Ohio St. 250, it is said: “ In our present constitution, as well as in the former, the general *534 grant of legislative authority includes the power of taxation in all its forms. Restrictions upon its exercise are to be looked for in other parts of the instruments.”
As a deduction from that proposition, the court sustains the validity of assessments in cities and towns. If article 12 was the source of the taxing power, this assessment, being in effect a tax, would have been invalid.
So in Reeves v. Treasurer of Wood County, 8 Ohio St. 333, it was held, that the power to levy and collect a local assessment was a branch or part of the general authority of the legislation, which exists in the state, as well before as after the adoption of the .constitution of 1851, and while it was a species of tax, yet it was not objectionable, because it was assessed in proportion to benefits conferred, and not ad valorem, as required by article 12, section 2.
This point was directly considered in Baker v. Cincinnati, 11 Ohio St. 534, under a law of the state which conferred upon cities and towns power to license shows and other performances, and to charge such sums of money as the council may think fit. Under an ordinance for that purpurpose, Baker was charged $1 for issuing a license to him, and $63.50 for the privilege of running a theater for six months, which was paid into the city treasury.
It was claimed there, as it is here, that this tax was prohibited by article 12, section 2, which provides for taxation by a uniform rule, on all kinds of property, according to its true value in money.
It was argued that property, and property alone, is the sole basis for raising revenue, and that the legislature had no power to collect revenues, or authorize municipal corporations to do so, by a tax on any business, pursuit, or avocation.
A remark, not necessary to the decision, is found in the opinion of the judge, in Exchange Bank v. Hines, 3 Ohio St. 10, and is cited in support of this argument.
In reply, Grholson, J., says : “ The legislative power of the state is found in article 2, section 1, and includes all the power which the objects of the state government may *535 require, and we must look to other provisions of the constitution to ascertain to what extent legislative discretion is qualified or restricted; that article 12, section 2, is not a grant of power, but a regulation of poioer already granted in the first section of the second article.’''
In that case, the court conclude that the power to authorize licenses is untouched by the constitution, except in case of intoxicating liquors.
How far, and to what extent, this power may be used to raise revenue in that mode, is mooted, but not considered, beyond the case before the court; but it is said: “ It may be admitted that it could not be employed as a mode of taxing property without reference to the uniformity or equality required by section 2, article 12.”
It was said the power to collect a tax on a license, the amount of which was in the discretion of the council, was analogous to the power to make assessments in the cases already cited, and the fact that the amount collected was greater than the cost of issuing the license, or that it went into the public treasury as a tax, did not affect its validity.
In speaking of section 2 of article 12, the learned judge says (p. 541) : “ The things in contemplation were property of every possible description, and an equal and uniform tax on that property, according to its true value in money. If there be a species of taxation or subject-matter of taxation not embraced in that section, there is nothing in it by which they are prohibited or excluded. Laws taxing property must certainly conform with that section.”
“ A license can not be regarded as property;” and it is added : “ Now neither of these sections in terms prohibits the granting of licenses and making a charge therefor, nor the imposition of a tax on a license.”
In Zanesville v. Richards, 5 Ohio St. 590, the court is careful to add to the opinion that while it extended to all laws providing for taxation within the meaning of that term as used in the constitution, it by no means followed that it covered “the whole ground included in the limits of the taxing power.”
*536 This article came under review in The Cincinnati Gas Co. v. The State, 18 Ohio St. 238, where it was held that a pro rata assessment according to valuation on the property of the gas companies in the state, to pay the salary of the state inspector of meters, was not in violation, of article 12, section 2.
It is there said this section relates to taxes to be raised on property, and that this is in the nature of a charge upon a business. It is said it does not follow that because the state is compelled to tax all property by a uniformr rule, that it is therefore cut off from all power to lay assessments and charges for exceptional and special purposes, and “ an express direction to impose a tax by a uniform rule, does not necessarily limit the power of taxation upon that which is not propei’ty.”
Again, under the police power of the state, it will not be denied that laws ai’e valid which impose fines, penalties, and forfeitures on classes of acts denominated eximes and misdemeanor’s, and which make these punishments a soux’ce of x’evenue.
The money or property arising from these fox’m part of the public revenue. They are in effect taxes on obnoxious acts, practices, and occupations.
So license taxes for the privilege of exhibiting shows, or to keep ferries, taverns, etc., and charges incident to inspection laws, are in the nature of taxes on trade or business.
The Hamilton county fee bill (67 Ohio L. and 68 Ohio L.) required all fees to be paid into the treasury, and provided for the payment of salaries to the officers out of the treasury.
In The State v. The Judges, 21 Ohio St. 1, the invalidity of this act was claimed on the ground, among others, that article 12, section 2, required that funds raised to carry on the government should be raised by a unifox’m tax on property, and forbids the methods of justice, or the process of. record of titles, or the functions of county officers being taxed.
*537 In case of a surplus of fees over salaries to the amount of $5,000 in either office, that surplus under the law went into the general funds of the county.
The court say, if, in the practical operation of the act, the effect should be to leave a surplus for the use of the county, which is contingent, this would result from the difficulty found in prescribing such rates of charges as to make the receipts equal to the salaries. It is held that the mode of paying public officers by fees exacted of suitors is not in conflict with article 12, and “ if these exactions are called taxes, they become none the less such as to those upon whom they are imposed by being paid to the officer, than if paid into the public treasury.” This law is an instance of the legislative power to levy taxes other than on property.
All fees are taxes on suitors, often quite onerous, for the privilege of using the courts to decide their controversies. Generally they go directly to the public officers, as their compensation for services rendered, but this case decides they may be paid directly into the public funds, and the officers may be compensated by salaries, and any surplus of( fees over salaries becomes public revenue for county purposes, in lieu of taxes on property.
Many of the states have constitutional provisions similar to ours, requiring uniformity in taxing property according to value, and these provisions have been under review by their highest courts.
In Glascow v. Rouse, 48 Mo. 479, it was said: “ The constitution enjoins a uniform rule as to the imposition of taxes on all property, but does not abridge the power of the legislature to provide for revenue from other sources.
“ Outside of the constitutional restriction, the legislature judge of the propriety of taxation, and define the sources of revenue as the exigencies of the case may require.”
In California, where the constitutional provision is almost a copy of ours, it was held, that a tax on business graduated by sales on monthly business, was not forbidden on the ground that it was not a tax on the goods, but on *538 the business, and if uniform on all business of that kind was unobjectionable. Sacramento v. Crocker, 16 Cal. 119.
In Georgia, in the case of The Home Ins. Co. v. The City of Augusta, 50 Geo. 543, several cases in that state are cited to the effect that a tax on professions was not in conflict with a provision that, “ Taxation ou property shall be ad valorem, and uniform on all species of property taxed.”
Therefore, it was held, that the city of Augusta might, under legislative authority, exact a fixed sum, without reference to capital or business, for the privilege of doing business, such sum not being a tax on property. To the same effect are Adams v. Mayor, and State v. Crawford, 2 Head, (Tenn.) 363, 460.
The same doctrine is affirmed in Walcut v. The People, 17 Mich. 68, and Kitson v. Mayor, 26 Mich. 325; Gilkerson v. Frederick Justices, 13 Grattan; Slaughter v. Commonwealth, 13 Grattan, 767; Ould & Carrington v. Richmond, 26 Grattan, 464; Carter v. Dow, 16 Wis. 298; Municipality v. Dubois, 10 La. 199; Bright v. McCollough, 27 Ind.
These cases from other states are cited to support our principal proposition, that the power to levy taxes is' a part of the legislative authority found in article 2, section 1, and that under it taxation in any of the modes known and practiced prior to the constitution of 1851, still exist, except so far as restricted by other pro visions of that instrument. Whether these cases which have been cited from other states, would be followed in Ohio, we need not now inquire. To the extent that they affirm that the provision for an ad valorem system of taxation on all property in the state, is not a surrender of the general power to raise revenue by other modes than upon the property of the state, we approve them.
The power to raise necessary funds to defray the legitimate expenses of government, is vital to the existence of the state. To this extent it can neither be surrendered nor granted away.
*539 Limitations and restrictions on this power found in the constitution are wise safeguards, to prevent its abuse, and to that end should receive a liberal construction; but we apprehend the canons of construction will not warrant the presumption that an acknowledged authority in the state has been surrendered by a wise limitation which relates only to the mode of taxing property, and which does not purport to limit the legislative authority as to other methods of providing public .revenue, much less by such construction to abridge the general police power of the state. The object of article 12, section 2, was to secure uniformity of taxes on all the property of the state not specially exempted.
It embodies the main features of “ an act for levying taxes on all property according to its true value in money ” (2 Curweu, 1260), known as the tax law of 1846.
No one ever supposed that the adoption of that act in 1846 was a surrender by the state of the general taxing power, or of the acknowledged authority to regulate or control any special or objectionable business, by fees, fines, penalties, and charges, which become a source of revenue.
To this branch of legislative authority belongs the power to create corporations, and to prescribe the terms and conditions upon which they may exercise their franchises. The power over foreign corporations is equally clear. They may be excluded from the state altogether, or admitted on such terms as the state may prescribe. They are not citizens, within the meaning of the federal constitution, “ entitled to all the privileges and immunities of citizens in the several states.”
They can exercise none of their powers or franchises within this state, except by comity or under legislative consent. Bank of Augusta v. Earle, 13 Pet. 519; Paul v. Virginia, 8 Wall. 168; Ducat v. Chicago, 10 Wall. 410; Liverpool Ins. Co. v. Massachusetts, 10 Wall. 567; Lafayette Ins. Co. v. French, 18 How, 404; The Fire Dept. v. Noble, 3 E.D. Smith, 440; DeGroat v. Van Duzen, 20 Wend. 390; Commonwealth v. Milton, 12 B. Mon. 212; Fire Dept. v. *540 Helfenstein, 16 Wis. 136. Such consent may be granted on such terms and conditions as the state may impose.
In Paul v. Virginia it is said: “ The state may exclude foreign corporations entirely; it may restrict it to particular localities, or exact such security for the performance of its contracts as will best promote the public interest. The whole matter rests in its discretion.”
Ducat v. Chicago, 48 Ill. 172, afterward affirmed in 10 Wallace, 410, is in point, and involved the validity of an act of Illinois imposing a • license fee, and a tax of two per cent, on all premiums, received by foreign insurance companies doing business within the state.
The validity of this act -was challenged: 1. Because the constitution, like ours, provided for an ad valorem system of taxation; and 2. Because this tax on premiums received by foreign corporations, was an unjust discrimination in favor of domestic corporations, and an interference with business between the states.
It was held valid by the supreme court of Illinois on both grounds; that court holding, that although taxes on property must be uniform, yet a tax on gross premiums of foreign insurance companies was not a tax on persons or property of the corporators.
The Supreme Court of the United States affirmed this judgment, following Paul v. Virginia, supra.
To the same effect are The Cin. Mut. Health Ass’n Co. v. Rosenthal, 55 Ill. 85; The Fire Dept. v. Noble, 3 E. D. Smith, 440; The Fire Dept. v. Wright, 3 E. D. Smith, 453
These last cases were affirmed by the court of appeals of New York.
If, therefore, under the power of taxation, or the general authority to exclude foreign corporations, or regulate the terms on which they may do business, or under both combined, this law can be sustained, it is our duty so to declare, for, unless it manifestly contravenes the constitution, the judicial department is not warranted in declaring it void.
We have seen that the fact, that revenue results from the exercise of legislative power, as in cases of fines, licenses, *541 etc., and that the law is in effect and practically a tax, does not invalidate it.
As was said in Baker v. Cincinnati, “ there is no magic in names.”
By the seventh section of this act (S. & S. 770), if the amount assessed “ shall remain due and unpaid to the treasurer of the county for the period of twenty days after the time provided by law for the payment thereof, it shall be unlawful for any person or persons, or corporations, to act as agents, or do or transact any business for such company so in default, of such county, until said taxes, interest, and penalties are fully paid.” Not only this, but heavy penalties are imposed on persons or railroad companies for acting for or transacting business for such defaulting corporation. These provisions amount to an exclusion of business from the state.
They are the conditions upon which the corporations named in the act are allowed to do business within the state.
Whether this tax is warranted by a wise public policy, and whether it is too onerous, are questions for the legislature and not for the courts.
The burden is the price paid for transacting their business within the state. Having their principal office in another state, where all their property, except the little that may be within the state, is located, and composed of corporators also beyond the state, they would otherwise be exonerated from an equal share of the public burdens.
Any regulations imposed on such corporations, not amounting to a regulation of commerce, nor to a tax on the property of a corporation within the state, imposed as a compensation to be paid to the state for the privilege of doing business within its territory, is, we think, within the legislative power of the general assembly.
The unbroken current of judicial authority is in support of such a power in the state, and in our opinion public policy demands its exercise.
Corporations have multiplied to an almost indefinite ex *542 tent in every state,'not only to do business at home, but in other states. In our own state, domestic corporations are subject to legislative control, and their stockholders are individually liable; but in case of foreign corporations, no such control exists, and their stockholders are beyond state authority.
These artificial beings control a large part of the active wealth of the country.
They exercise a concentrated power for good or evil, far greater than natural persons possibly can.
If such organizations, composed of persons residing out of the state, and clothed with loose and unguarded powers by other states or nations, can exercise their franchises within the state without sharing the public burdens of that government which protects them, and free from the control and responsibility to which domestic corporations are subject, it is easy to see that the day is not far distant, when, with these superior advantages, the most important business interests in the state will have passed beyond its control.

Judgment affirmed.